UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED FARM WORKERS, et al., | No. 1:20-cv-01452-DAD-JLT |
| Plaintiffs, | |
| v. | ORDER GRANTING PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION |
| SONNY PERDUE, et al., | |
| Defendants. | (Doc. No. 3) |

This matter came before the court on October 20, 2020 for a hearing on the motion for a temporary restraining order and a preliminary injunction on behalf of plaintiffs United Farm Workers and UFW Foundation (collectively, "plaintiffs"). (Doc. No. 3.) Attorneys Mark Selwyn, Rachel Jacobson, Gregory Lantier, Nicholas Werle, Bruce Goldstein, and Gabriela Hybel appeared via video for plaintiffs, and United States Department of Justice Trial Attorney Michael Gaffney appeared via video for defendants Sonny Perdue, the Secretary of Agriculture; William Northey, the United States Department of Agriculture's ("USDA") Under Secretary for Farm Production and Conservation; and USDA (collectively, "defendants"). For the reasons explained below, the court will grant plaintiffs' motion for a temporary restraining order and a preliminary injunction.

/////

**BACKGROUND**

In their complaint, plaintiffs allege the following.  Federal law instructs the United States Secretary of Agriculture to procure and preserve information concerning agriculture, including "by the collection of statistics" and "any other appropriate means within his power."  (Doc. No. 1 ("Compl.") at ¶ 20.)  Since 1910, the Secretary has satisfied that statutory mandate in part by conducting the Agricultural Labor Survey, often referred to as the Farm Labor Survey ("FLS").  (*Id.* at ¶ 21.)  The FLS collects information from farm employers to obtain data on farm employment, hours worked, wages paid, and other statistics.  (*Id.*)  For over 100 years, defendant USDA has consistently employed the FLS to collect data regarding farm labor and wages.  (*Id.*)  The FLS is traditionally conducted in April and October.  (*Id.* at ¶ 22.)  During those months, the survey collects wage and employment data for four reference weeks, one in each quarter, from farms and ranches with $1,000.00 or more in annual agricultural sales revenue for all states except Alaska.  (*Id.*)  The FLS samples approximately 35,000 farms and ranches.  (*Id.*)  Most FLS data is collected by mail and computer-assisted phone interviews, with personal interviews used for some large operations and those with special handling arrangements.  (*Id.*)

The National Agricultural Statistics Service—USDA's statistical branch—publishes the FLS data semiannually in May and November in the Farm Labor Report ("FLR").  (*Id.* at ¶ 23.)  The May report includes employment and wage estimates based on January and April reference weeks, and the November report includes estimates based on July and October reference weeks.  (*Id.*)  The report includes quarterly estimates of the number of hired workers and average hours worked per worker during each reference week.  (*Id.*)  The report also includes quarterly estimates of average hourly wage rates for field workers; livestock workers; field and livestock workers combined; and all hired workers, including supervisors, managers, and other workers.  (*Id.*)  The November report, in addition, provides annual data based on the quarterly estimates.  (*Id.*)

The H-2A agricultural guest worker program permits agricultural employers to hire foreign workers to perform agricultural work on a temporary basis when domestic labor markets cannot supply an adequate number of workers at a particular time for a certain job.  (*Id.* at ¶ 36.)

2

Employers are only authorized to hire foreign guest workers, however, if the United States Department of Labor ("DOL") certifies that the foreign workers' temporary employment "will not adversely affect the wages and working conditions of workers in the United States similarly employed." (*Id.*)  To avoid adverse effects to U.S. workers' wages, DOL regulations require that employers utilizing the H-2A program pay a wage that is the highest of the (1) Adverse Effect Wage Rate ("AEWR"), (2) the prevailing wage rate,[1] (3) an agreed-upon collective bargaining wage, or (4) the federal or state minimum wage.  (*Id.* at ¶ 37.)

Under those regulations, the DOL relies primarily on a two-pronged approach based on the AEWR and prevailing wage rate to guard against wage depression that would otherwise result from the hiring of large numbers of foreign agricultural workers.  (*Id.* at ¶ 38.)  The prevailing wage rate protects local wages paid for particular jobs, while the AEWR sets a state-wide wage floor to prevent wage disparities for jobs at H-2A employers in larger areas.  (*Id.*)  The DOL has recognized that it is the existence of both the AEWR and prevailing wage rates that ensures that U.S. workers are adequately protected from decreased wages caused by an influx of foreign guest workers.  (*Id.*)  The AEWR, however, is the primary wage rate under the H-2A program because it is higher than the other minimum wages in most circumstances.  (*Id.*)  As a result, the AEWR determines the wages of approximately 92 percent of the farmworkers employed by H-2A program employers.

DOL regulations have required the DOL to use the FLS to calculate the AEWR for the H-2A program since the program's inception in 1986, and the DOL has used FLS data for the H-2A's predecessor program since 1953.  (*Id.* at ¶ 39.)  Because of the DOL's longstanding reliance on the survey, defendant USDA conducts the FLS in cooperation with the DOL, and the DOL has funded the FLS since July 2011 pursuant to a memorandum of understanding between the two agencies.  (*Id.*)  In 2010, the DOL recognized that using data other than the FLS to calculate AEWRs "entails a significant risk that U.S. workers may in the future experience wage

---

[1]  Plaintiffs note in their motion that under the H-2A program, the "prevailing wage" is based on the wages paid in a local geographic area for a particular job.  (Doc. No. 3 at 11) (citing Doc. No. 3-10).

depression as a result of unchecked expansion of the demand for foreign workers." (*Id.* at ¶ 40.) The DOL explained that "[t]he FLS is the only annually available data source that actually uses information sourced directly from farmers," which "is a strong advantage of the FLS as the AEWR data source compared to all other alternatives." (*Id.*)   The DOL similarly explained in a 2019 notice of proposed rulemaking that "[t]he FLS [remained] the Department's preferred wage source for establishing the AEWR because it is the only comprehensive wage survey that collects data from farm and ranch employers." (*Id.* at ¶ 41.)   The DOL also recognized that it had "always used the FLS to set the H-2A AEWR, with the exception of a brief period under" its 2008 rule. (*Id.*)   Most states do not collect, and therefore do not publish, local prevailing wage rates for jobs subject to the H-2A program.  (*Id.* at ¶ 59.)   And most states that do publish prevailing wage rates do not publish prevailing wage rates for general crop workers.  (*Id.*)   Accordingly, in the absence of the AEWR, most minimum H-2A wages would be determined by the highest of the federal minimum wage of $7.25 per hour or the applicable state minimum wage.  (*Id.*)

Agricultural employers have continued to rely heavily on the H-2A program in 2020, and their substantial use of that program will likely continue in 2021.  (*Id.* at ¶ 55.)   During the first three quarters of the 2020 fiscal year, the DOL received 12,351 applications from employers seeking certification for 232,362 H-2A workers and approved the hiring of 224,290 of those workers.  (*Id.*)   Employers in Washington State received approvals to hire 24,785 H-2A workers, and California employers received approvals to hire 21,337 H-2A workers.  (*Id.*)   The October 2020 survey was expected to be conducted from on or about October 19, 2020 through on or about November 7, 2020, and the FLR was expected to be published in or about the week of November 23, 2020.  (*Id.* at ¶ 22.)

On September 30, 2020, defendant USDA published a cursory, one-page notice ("the Suspension Notice") in the Federal Register announcing the suspension of October 2020 FLS data collection and the cancellation of its November 2020 publication of the biannual FLR.  (*Id.* at ¶¶ 2, 26); *see also Notice of Revision to the Agricultural Labor Survey and Farm Labor Reports by Suspending Data Collection for October 2020*, 85 Fed. Reg. 61719 (Sept. 30, 2020). According to plaintiffs, defendant USDA did not solicit any public comment or employ any

4

formal rulemaking procedures despite the Suspension Notice amounting to final agency action with respect to the suspension of FLS data collection and FLR publication, and defendant USDA lacks any rationale for suspending the FLS data collection and FLR publication.  (Compl. at ¶¶ 26, 27.)

Plaintiffs filed their complaint against defendants seeking declaratory and injunctive relief on October 13, 2020.  (Compl.)  Plaintiffs' complaint asserts three claims for relief:  (1) a violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, based upon defendant USDA's failure to consider important aspects of its decision in this regard; (2) a violation of the APA, 5 U.S.C. § 706, based upon defendant USDA's failure to offer a reasoned explanation for its decision; and (3) a violation of the APA, 5 U.S.C. § 553, due to defendant USDA's failure to comply with the requirements of notice-and-comment rulemaking.  Plaintiffs filed the pending motion for a temporary restraining order and a preliminary injunction on October 13, 2020.  (Doc. No. 3.)  On October 19, 2020, defendants filed their opposition to plaintiffs' motion.  (Doc. No. 27.)  The hearing on plaintiffs' motion was held on October 20, 2020.  The day after that hearing, defendants filed a notice stating that the DOL had transmitted to the Office of Information and Regulatory Affairs ("OIRA") a draft final rule for adopting a new AEWR methodology on October 21, 2020.  (Doc. No. 30); *see also See OIRA, Pending EO 12866 Regulatory Review* (October 21, 2020), https://www.reginfo.gov/public/do/eoDetails?rrid=131303.  Plaintiffs immediately filed a response to defendants' notice on October 21, 2020.  (Doc. No. 31.)

## LEGAL STANDARD

The standard governing the issuing of a temporary restraining order is "substantially identical" to the standard for issuing a preliminary injunction.  *See Stuhlbarg Intern. Sales Co. v. John D. Brush & Co*., 240 F.3d 832, 839 n. 7 (9th Cir. 2001).  "The proper legal standard for preliminary injunctive relief requires a party to demonstrate 'that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'"  *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (quoting *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008)); *see also Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1172 (9th

Cir. 2011) ("After *Winter*, 'plaintiffs must establish that irreparable harm is likely, not just possible, in order to obtain a preliminary injunction.'"); *Am. Trucking Ass'n, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009).  The Ninth Circuit has also held that an "injunction is appropriate when a plaintiff demonstrates . . . that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor." *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011) (quoting *Lands Council v. McNair*, 537 F.3d 981, 97 (9th Cir. 2008) (*en banc*)).[2]  The party seeking the injunction bears the burden of proving these elements.  *Klein v. City of San Clemente*, 584 F.3d 1196, 1201 (9th Cir. 2009); *see also Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) ("A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief.")  Finally, an injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter*, 555 U.S. at 22.

## ANALYSIS

Here, plaintiffs seek a temporary restraining order and a preliminary injunction:  (1) barring defendants from discontinuing the FLS and ceasing publication of the FLR as defendant USDA announced on September 30, 2020 was its intention, and (2) requiring defendants to maintain the status quo by continuing to conduct the FLS that had previously been scheduled to begin on or around October 19, 2020, and publishing the next edition of the FLR that had been scheduled for November 2020.  (Doc. No. 3 at 6.)

"The APA sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts."  *Dep't of Homeland Sec. v. Regents of the Univ. of California*, __U.S.__, 140 S. Ct. 1891, 1905 (2020) (internal citation and quotation marks omitted).  Only "final agency actions" are reviewable under the APA.  5 U.S.C. § 704; *see*

---

[2]  The Ninth Circuit has found that this "serious question" version of the circuit's sliding scale approach survives "when applied as part of the four-element *Winter* test."  *All. for the Wild Rockies*, 632 F.3d at 1134.  "That is, 'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest."  *Id.* at 1135.

*also* 5 U.S.C. § 701 (for purposes of the APA's judicial review provisions, "agency action" has "the meaning[] given" by § 551).  An "'agency action' includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C. § 551(13).  The Act "requires agencies to engage in reasoned decisionmaking, and directs that agency actions be set aside if they are arbitrary or capricious."  *Regents*, 140 S. Ct. at 1905 (internal citations and quotation marks omitted).  An agency's "determination in an area involving a 'high level of technical expertise'" is to be afforded deference.  *Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir. 2008) (*en banc*) (citing 5 U.S.C. § 706(2)(A)), *overruled on other grounds by Winter*, 555 U.S. 7.  The district court's role "is simply to ensure that the [agency] made no 'clear error of judgment' that would render its action 'arbitrary and capricious.'"  *Id.* (citing *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)).

Under § 706 of the APA, the court is "to assess only whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Regents*, 140 S. Ct. at 1905 (internal citation and quotation marks omitted).  "Factual determinations must be supported by substantial evidence," and "[t]he arbitrary and capricious standard requires 'a rational connection between facts found and conclusions made.'"  *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 759–60 (9th Cir. 2014) (internal citations omitted).

> This requires the court to ensure that the agency has not, for instance, "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [an explanation that] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

*McNair*, 537 F.3d at 987 (quoting *Motor Vehicle Mfrs. Assn., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

As noted, plaintiffs must make a sufficient showing as to all four prongs of the *Winter* test in order to be entitled to the requested preliminary relief.  *All. for the Wild Rockies*, 632 F.3d at 1135.  Before considering those factors and plaintiffs' showing with respect to each, the court will first address when review of an agency decision under the APA is appropriate.

1     **A.**     **Administrative Procedure Act Requirements**

2        As a threshold matter, defendants argue that the Suspension Notice at issue here is not

3 reviewable under the APA for two reasons: (1) defendant USDA's decision is an exercise of

4 unreviewable agency discretion; and (2) the controversy is not ripe in that the decision to suspend

5 FLS data collection is not final agency action from which legal consequences directly flow.

6 (Doc. No. 27 at 16–21.) The court considers each of defendants' arguments in turn below.

7        1.     Whether the Suspension Notice is an Exercise of Unreviewable Agency Discretion

8        First, defendants argue that the decision to suspend collection of FLS data and publication

9 of the FLR is committed solely to agency discretion and is therefore unreviewable. The APA

10 does not provide review for "agency action" that "is committed to agency discretion by law." 5

11 U.S.C. § 701(a)(2). An action is committed to agency discretion, and therefore beyond the scope

12 of APA review, "if the statute is drawn so that a court would have no meaningful standard against

13 which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830

14 (1985). "A statute need not expressly preclude review for the agency's action to be 'committed to

15 agency discretion.'" *Int'l Bhd. Of Teamsters v. U.S. Dep't of Transp.*, 861 F.3d 944, 954 (9th Cir.

16 2017) (internal citation omitted).

17        This doctrine is intended to prevent judicial interference with those agency decisions that

18 "'involve[] a complicated balancing of a number of factors which are peculiarly within [an

19 agency's] expertise,'" leaving "'no meaningful standard against which to judge the agency's

20 exercise of discretion.'" *Lincoln v. Vigil*, 508 U.S. 182, 190–91 (1993) (quoting *Heckler*, 470

21 U.S. at 830). But "the § 701(a)(2) exception for action committed to agency discretion [is to be

22 read] quite narrowly, restricting it to those rare circumstances where the relevant statute is drawn

23 so that a court would have no meaningful standard against which to judge the agency's exercise

24 of discretion." *Dep't of Commerce v. New York*, __U.S.__, 139 S. Ct. 2551, 2568 (2019)

25 (internal citation and quotation marks omitted). Application of this doctrine has, however,

26 generally been limited to "categories of administrative decisions that courts traditionally have

27 regarded as committed to agency discretion, such as a decision not to institute enforcement

28 /////

proceedings, or a decision by an intelligence agency to terminate an employee in the interest of national security." *Id.* (internal citations and quotation marks omitted).

Defendants assert that this case presents a statutory and regulatory void similar to that considered by the Supreme Court in *Lincoln v. Vigil*, 508 U.S. 182 (1993). There, the Indian Health Service decided to discontinue a clinical program for children and reallocate appropriations for a nationwide treatment program. The court explained that the relevant appropriations Acts did "not so much as mention the Program, and both the Snyder Act and the Improvement Act likewise speak about Indian health only in general terms." *Id.* at 193. "Like the decision against instituting enforcement proceedings, then, an agency's allocation of funds from a lump-sum appropriation requires 'a complicated balancing of a number of factors which are peculiarly within its expertise.'" *Id.* The court therefore ruled that the "decision to terminate the Program was committed to the Service's discretion" and was "accordingly unreviewable under 5 U.S.C. § 701(a)(2)." *Id.* at 194.

The undersigned is not persuaded that the holding in *Lincoln* is applicable here. Rather, this case is more analogous to that considered by the Supreme Court in *Department of Commerce v. New York*, __U.S.__, 139 S. Ct. 2551 (2019). There, a group of plaintiffs challenged the Secretary of Commerce's decision to reinstate a question about citizenship on the 2020 census questionnaire on both constitutional and statutory grounds. The government asserted that "the Census Act commits to the Secretary's unreviewable discretion decisions about what questions to include on the decennial census questionnaire." *Id.* at 2567–68. The Supreme Court rejected that argument, holding that while the Act did confer broad authority to the Secretary, it "do[es] not leave his discretion unbounded" since the taking of the census is not one of those areas traditionally committed to agency discretion. *Id.* at 2568. The court distinguished the Census Act from the National Security Act, "which gave the Director of Central Intelligence discretion to terminate employees whenever he 'deem[ed]' it 'advisable.'" *Id.* Furthermore, the court noted, "by mandating a population count that will be used to apportion representatives, the Act imposes a duty to conduct a census that is accurate and that fairly accounts for the crucial representational

/////

9

rights that depend on the census and the apportionment." *Id.* at 2568–69 (internal citations and quotation marks omitted).

In the present case, the Suspension Notice was issued under the authority of 7 U.S.C. § 2204(a), which directs the Secretary of Agriculture to

> procure and preserve *all* information concerning agriculture . . . which he can obtain by means of books and correspondence, and by practical and scientific experiments, accurate records of which experiments shall be kept in his office, by the collection of statistics, and by any other appropriate means within his power.

(emphasis added). Defendant USDA itself has noted that "[t]he 1938 Agricultural Adjustment Act, as amended, requires USDA to compute parity prices of farm products," and that computation requires an index of wage rates. *Submission for OMB Review; Comment Request*, 83 Fed. Reg. 50631-02. "Agricultural labor statistics are an integral part of National Agricultural Statistics Service (NASS) primary function of collecting, processing, and disseminating current state, regional, and national agricultural statistics," and the FLS "is the only timely and reliable source of information on the size of the farm worker population." *Id.* Although defendants assert that the DOL recognized in 2008 and 2011 that the FLS could be suspended (Doc. No. 27 at 18), that fact itself does not render defendant USDA's decision unreviewable. As plaintiffs' counsel noted at the hearing on the pending motion, so long as defendant USDA's FLS and FLR are the sole means for the DOL to compute the AEWR, defendant USDA lacks discretion to simply end the survey without articulating a compelling rationale until and unless an adequate replacement or regulation is in place.

In short, the court is not persuaded that the Suspension Notice is an exercise of unreviewable agency discretion. The Agricultural Adjustment Act imposes a duty on defendant USDA to procure agricultural statistics, including those that affect farmworkers' wage rights. The statute does not include unbounded discretionary language, but instead directs the Secretary of Agriculture to collect *all* statistics. Thus, this situation is distinguishable from those where there is no meaningful standard against which to judge the agency's exercise of discretion, particularly since the FLS is recognized as the *only* reliable source of farmworker wage information. Accordingly, the court will review the Suspension Notice under § 701 of the APA.

2.     Whether the Suspension Notice is a Final Agency Action Ripe for Review

The court must next determine whether the Suspension Notice constitutes a final agency action as defined by the APA.  As noted above, only "final agency actions" are reviewable.  5 U.S.C. § 704.  To be final, an agency action must satisfy two conditions:

> First, the action must mark the "consummation" of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature.  And second, the action must be one by which "rights or obligations have been determined," or from which "legal consequences will flow."

*Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).  "The general rule is that administrative orders are not final and reviewable unless and until they impose an obligation, deny a right, or fix some legal relationship as a consummation of the administrative process."  *Ukiah Valley Med. Ctr. v. F.T.C.*, 911 F.2d 261, 264 (9th Cir. 1990) (internal citation and quotation marks omitted).  "Other relevant factors include whether the order has the status of law or comparable legal force, and whether immediate compliance with its terms is expected."  *Id.*

While there are limits to what constitutes an "agency action" in this sense, the Supreme Court has held that "[t]he bite in the phrase 'final action' . . . is not in the word 'action,' which is meant to cover comprehensively every manner in which an agency may exercise its power.  It is rather in the word 'final.'"  *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 478 (2001).  Courts have concluded that "agency action" is to be broadly defined, and "[e]ach word in that definition has its own expansive definition."  *Nat'l Urban League v. Ross*, No. 20-cv-05799-LHK, 2020 WL 5739144, at *19 (N.D. Cal. Sept. 24, 2020), *order clarified*, No. 20-cv-05799-LHK, 2020 WL 5876939 (N.D. Cal. Oct. 1, 2020).

Here, defendants argue that the Suspension Notice cannot be categorized as any type of agency action.  (Doc. No. 27 at 18–19.)  In making this argument they emphasize that

> the term "agency action" is "not so all-encompassing as to authorize us to exercise judicial review over everything done by an administrative agency."  *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004), [and] "[m]uch of what an agency does is in anticipation of agency action," such as "conduct[ing] studies."  *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 19 (D.C. Cir. 2006).

/////

11

(Doc. No. 27 at 19.)  Defendants contend that even if the Suspension Notice is an agency action, it is not a final one.  Defendants do not address the first prong of *Bennett* which requires that the action must mark the "consummation" of the agency's decisionmaking process.  Instead, they argue the Suspension Notice does not satisfy the second prong—that legal consequences do not flow from the Suspension Notice—because it does not have any "direct and immediate effect" on plaintiffs and it does not demand "immediate compliance" with its terms.  (Doc. No. 27 at 20) (citing *Indus. Customers of Nw. Utils. v. Bonneville Power Admin.*, 408 F.3d 638, 646 (9th Cir. 2005)).  Defendants contend that plaintiffs' speculative concerns are ultimately "about downstream actions that may or may not occur at a later date by a separate entity—principally DOL."  (*Id.*)

Attached to defendants' opposition to the pending motion is the declaration of Brian Pasternak, the current Administrator of the Office of Foreign Labor Certification, Employment and Training Administration ("OFLC") at the DOL, who has served in senior management positions at the OFLC since 2006.  (Doc. No. 27-1.)  Therein, declarant Pasternak acknowledges that because FLS data is necessary for publishing AEWRs under DOL's current H-2A regulations, there is immediate need for DOL regulatory action to revise the AEWR methodology as a result of defendant USDA's recently issued Suspension Notice.[3]  (*Id.* at ¶¶ 7, 9.)  Declarant Pasternak also declares that the DOL is "taking this issue under consideration as it develops a final rule establishing a new AEWR methodology, which it intends to publish and have effective before the end of the calendar year to ensure that there is no disruption in setting these AEWRs

---

[3]  At the hearing on the pending motion, the court noted the brevity and lack of detail of the Pasternak Declaration.  The court has read that declaration carefully.  In it, declarant Pasternak states that his office was first notified of defendant USDA's intent to terminate the existing memorandum of understanding between the DOL and USDA for the collection, computation and publication of the required information on September 14, 2020.  (Doc. No. 27-1 at 2, ¶ 6.)  This was less than a year after the memorandum was entered into by the two agencies and only sixteen days before defendant USDA published its one-page Suspension Notice in the Federal Register.  As declarant Pasternak has characterized in an understated manner, defendant USDA's decision to issue its Suspension Notice has created "the immediate need for regulatory action" on the part of the DOL (Doc. No. 27–1 at ¶ 9), because it appears the survey it is required to rely upon will not, absent the granting of the pending motion, exist.  It seems apparent based upon a fair reading of the Pasternack Declaration that this was not a fully coordinated action between the DOL and defendant USDA, and that the DOL is now scrambling.

1   for calendar year 2021."  (*Id.* at ¶ 9.)  On October 21, 2020, defendants filed a notice stating that

2   DOL's final rule had been submitted to OIRA for review.  (Doc. No. 30.)  In their opposition to

3   the pending motion, defendants argue that "[p]laintiffs cannot seek to challenge that potential rule

4   indirectly through USDA's decision, which they concede would only be one intermediate step in

5   whatever decision DOL ultimately reaches."  (*Id.* at 21.)

6        The undersigned finds the decision in *Gifford Pinchot Task Force v. Perez*, No. 03:13-cv-

7   00810-HZ, 2014 WL 3019165 (D. Or. July 3, 2014) to be instructive under these circumstances.

8   In that case, plaintiffs challenged the issuance of a Bureau of Land Management ("BLM") permit

9   to engage in mining operations and the United States Forest Service's consent to the project.  The

10  Forest Service contended that, in contrast to BLM's permit, its consent to the project did not

11  constitute a reviewable "final agency action."  *Id.* at *6.  The district court disagreed:

12         Defendants' argument fails to recognize that the definition of agency
           action in section 551(13) includes the whole or a part of an agency
13         rule, order, license, sanction, etc.  The definitions for each type of
           action also include a "part" of an action . . ..
14
15         It is undisputed that the USFS's consent was a prerequisite for the
           BLM's issuance of the permits.  Without seeking and obtaining the
16         USFS's consent, the permits could not issue.  Additionally, the BLM
           relied on the USFS's consent decision in issuing the permit,
17         effectively incorporating the consent and the conditions into its own
           [decision]. . . In the face of its express reliance on the determinations
18         and consent of the USFS, Defendants cannot deny that the USFS's
           consent was part of the permitting process and thus, is agency action
19         within the meaning of the APA.

20  *Id.*

21        Likewise, the Suspension Notice at issue in this case is an agency action because it is part

22  of another agency action:  the DOL's creation of a methodology for calculating the AEWRs.  The

23  AEWR calculation methodology is indisputably an agency action and has in the past been

24  challenged as an agency action.[4]  In their opposition brief and at the hearing on the pending

25  ────────────────────

26  [4]  Indeed, in July 1981 when the USDA announced it would be transitioning from a quarterly
    survey to an annual survey measuring only one week in July, the DOL took actions to develop a
27  substitute methodology for calculating the AEWRs.  *Shoreham Co-op. Apple Producers Ass'n,
    Inc. v. Donovan*, 764 F.2d 135, 137–38 (2d Cir. 1985).  "The action taken by DOL in developing
28  a substitute methodology for AERs has embroiled the agency in many lawsuits."  *Id.*

motion, defendants' counsel suggested that any challenge should be brought by plaintiffs against the DOL's impending final rule.  By advancing that argument defendants have implicitly conceded that calculating the AEWRs is an agency action.  Just as the Forest Service's consent was a prerequisite for the issuance of BLM's permits in *Perez*, the issuance of the FLS is a prerequisite to calculating the AEWRs because current DOL regulations require it to rely on the FLS in doing so.  *See* 20 C.F.R. § 655.103(b) (defining the AEWRs as being based on the FLS).  Both defendant USDA and the DOL have repeatedly acknowledged this fact.  (*See, e.g*, Doc. Nos. 3-11 at 1; 27-1 at ¶¶ 7, 9); 83 Fed. Reg. at 50632 (recognizing that the "[c]omprehensive and reliable agricultural labor data" provided by the FLS "are . . . needed by [DOL] in the administration of the 'H-2A' program"); 75 Fed. Reg. at 6898 (explaining that "[t]he FLS is the only annually available data source that actually uses information sourced directly from farmers").  "In the face of [DOL's] express reliance on" the FLS, defendant USDA cannot deny that its issuing of the FLS is a critical part of calculating the AEWRs and thus is an agency action.  *See Perez*, 2014 WL 3019165, at *6.  By extension, suspending the FLS is also an agency action for purposes of review under the APA.

In determining that the issuance of the Suspension Notice is a final agency action, the court notes that neither party disputes that the Suspension Notice was the "consummation" of defendant USDA's decisionmaking process.  Thus, the court finds that the first *Bennett* prong is satisfied.  The court also finds that the second prong of the *Bennett* test is satisfied here because legal consequences flow from the issuance of the Suspension Notice.  In this regard, legal rights are impacted by the DOL's calculation of the AEWRs because the AEWRs affect the rights and obligations of many H-2A farmworkers and their employers.  *See Mendoza v. Perez*, 754 F.3d 1002, 1008, 1019–20 (D.C. Cir. 2014) (finding that the DOL guidance letters eliminating the AEWRs ultimately "allow[ed] employers to pay the higher of only the prevailing wage rate or the legal minimum wage rate" and "meaningfully altered the rights and obligations of herders and their employers").  In the same way, legal consequences flow from the suspension of the FLS.  *See Perez*, 2014 WL 3019165, at *7 (concluding that the second prong of the *Bennet* analysis was satisfied because BLM could not issue the permit without the Forest Service's determinations,

14

1    and "[t]hus, the USFS's consent was not like a recommendation from a subordinate; it was a

2    condition required by an equal agency partner").  Moreover, because the FLS "is the only timely

3    and reliable source of information on the size of the farm worker population," 83 Fed. Reg. at

4    50632, legal consequences would flow from an inaccurate tabulation of wage rates.  *See Nat'l

5    Urban League*, 2020 WL 5739144, at *23 (finding that because the Department of Commerce's

6    new census collection plan would "likely result in an inaccurate enumeration, the [plan] [was] an

7    action from which legal consequences [would] flow").  Accordingly, the court concludes that the

8    issuance of the Suspension Notice is a final agency action.

9    **B.     Likelihood of Success on the Merits**

10       The court now turns to the merits of the pending motion.  Plaintiffs bear the burden of

11   demonstrating that they are likely to succeed on the merits of this action or, at the very least, that

12   "serious questions going to the merits were raised."  *All. for the Wild Rockies*, 632 F.3d at 1131.

13       1.    Whether the Suspension Notice is Arbitrary and Capricious Because USDA Failed
             to Consider the Decision's Impact on the H-2A Program and Farmworker Wages
14           or the Reliance Interests of Public Agencies and Private Parties

15

16       In their first claim, plaintiffs allege that the Suspension Notice is arbitrary and capricious

17   for two reasons:  (1) "it 'entirely fail[s] to consider . . . important aspect[s] of the problem' before

18   the agency," such as the decision's impact on farmworker wagers; and (2) "it 'fail[s] to address'

19   the 'serious reliance interests' implicated by discontinuing the long-standing survey that it has

20   repeatedly and consistently recognized is integral to assessing farm labor in the United States and

21   fulfilling various federal policy objectives."  (Compl. at ¶¶ 65–69.)  The court will consider each

22   argument in turn.

23              a.     *Effects on H-2A Wages and Farmworkers*

24       First, plaintiffs argue that defendant USDA failed to consider the impact that

25   discontinuation of the FLS would have on the H-2A program.  (Doc. No. 3 at 15.)  The APA's

26   arbitrary and capricious standard requires the agency to "examine the relevant data and articulate

27   a satisfactory explanation for its action including a 'rational connection between the facts found

28   and the choice made.'"  *State Farm*, 463 U.S. at 43.

Here, plaintiffs assert that by discontinuing the FLS, defendant USDA will effectively eliminate the AEWRs under the H-2A program and allow employers to pay H-2A farmworkers the highest of the prevailing wage rate, an agreed-upon collective bargaining wage, or the federal or state minimum wage.  (Doc. No. 3 at 15–16) (citing 20 C.F.R. § 655.120(a)).  According to plaintiffs, this will result in lower wages for both U.S. and H-2A farmworkers because in most circumstances, alternative wage rates either do not exist or are less than the AEWR.  (Doc. No. 3 at 16) (citing *Temporary Agricultural Employment of H-2A Aliens in the United States*, 75 Fed. Reg. at 6893 n.7, 6897).

To illustrate this point, plaintiffs have submitted the declaration of plaintiffs' counsel Joseph Taylor Gooch.  (Doc. No. 3-1.)  Attached to the Gooch Declaration is an excerpt of the DOL's H-2A Fiscal Year 2020 Quarter 3 Disclosure File, reflecting that the DOL certified 21,740 H-2A positions in California through the third quarter of fiscal year 2020.  (Doc. No. 3-13.)  According to plaintiffs, those employers were required to pay their U.S. and H-2A workers a minimum wage of $14.77 under the AEWR.  (*See* Doc. No. 3-14.)  For most crops, California did not publish local prevailing wages in 2020.[5]  (*See* Doc. No. 3-15.)  As a result, without the AEWR, the minimum H-2A wage paid at most H-2A employers in 2021 would be California's minimum wage of $14.00.  (*See* Doc. No. 3-16.)  Thus, according to plaintiffs, eliminating the AEWR in 2021 would result in wages that are at least $0.77 lower per hour than they otherwise would be had the AEWR been calculated, resulting in lost income totaling $1,601.60 over the course of a year for U.S. and H-2A workers.  (Doc. No. 3 at 16.)  According to plaintiffs, those losses do not even account for the likely increase in AEWRs in 2021, meaning that the decrease to farmworkers' wages would be even greater.  (*See* Doc. No. 3-17) (documenting a 5.44 percent average yearly increase to California AEWR between 2015 and 2020).  Plaintiffs aver that in states like Oregon and Idaho, these impacts on wages paid to farmworkers are even greater.  (*See* Doc. No. 3 at 17–18.)  Notably, defendants do not respond to these arguments in their opposition.

---

[5]  According to plaintiffs, "[p]revailing wage rates are published for specific regions and agricultural jobs, which are often defined by crop.  For example, the only prevailing wage published for California in 2020 was for farmworkers in the 'North Coast' region working 'Wine Grape Harvest' jobs."  (Doc. No. 3 at 16 n.6) (citing Doc. No. 3-15).

1    The court finds that plaintiffs are likely to succeed on the merits of this claim.  As

2  plaintiffs note, defendant USDA's cursory, one-page decision provides no indication that the

3  USDA considered the impact on farmworker wages caused by its decision to eliminate the FLS.

4  (Doc. No. 3 at 18.)  Rather, the Suspension Notice acknowledges that the FLS' "wage rates have

5  been used in the administration of the H-2A Program and for setting Adverse Effect Wage

6  Rates," but summarily concludes that "the public can access other data sources for the data

7  collected in the" FLS.  85 Fed. Reg. 61719.  Because defendant USDA "should have considered

8  those matters but did not," plaintiffs have shown a likelihood of succeeding on the claim that this

9  "failure was arbitrary and capricious in light of the APA."  *Regents*, 140 S. Ct. at 1915.

10               b.    *Reliance Interests of Public Agencies and Private Parties*

11     Next, plaintiffs argue that defendant USDA failed to consider the "serious reliance

12  interests" caused by defendant USDA's century-old practice of conducting the FLS.  (Doc. No. 3

13  at 18.)

> 14       Agencies are free to change their existing policies as long as they
>          provide a reasoned explanation for the change.  *See, e.g.*, *National
> 15       Cable & Telecommunications Assn. v. Brand X Internet Services*,
>          545 U.S. 967, 981–982, 125 S. Ct. 2688, 162 L.Ed.2d 820 (2005);
> 16       *Chevron*, 467 U.S., at 863–864, 104 S. Ct. 2778.  When an agency
>          changes its existing position, it "need not always provide a more
> 17       detailed justification than what would suffice for a new policy
>          created on a blank slate."  *FCC v. Fox Television Stations*, 2126 Inc.,
> 18       556 U.S. 502, 515, 129 S. Ct. 1800, 173 L.Ed.2d 738 (2009).  But
>          the agency must at least "display awareness that it is changing
> 19       position" and "show that there are good reasons for the new policy."
>          *Ibid.* (emphasis deleted).  In explaining its changed position, an
> 20       agency must also be cognizant that longstanding policies may have
>          "engendered serious reliance interests that must be taken into
> 21       account."

22  *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125–26 (2016).

23     Here, plaintiffs assert that several public agencies and private parties have historically

24  relied on the FLS data.  As explained above, defendant USDA has acknowledged that the DOL

25  needs FLS data to compute the AEWR under the H-2A program.  *See, e.g.*, 83 Fed. Reg. at

26  50632; 75 Fed. Reg. at 6898.  Defendant USDA also entered into a memorandum of

27  understanding with the DOL in late 2019, less than a year ago, which explicitly acknowledged

28  that the DOL's "continued and recurring bona fide need for the information provided by the

[FLS], which will allow [DOL] to produce the official AEWRs," and that "it is not possible for [DOL] to obtain the needed information by any other means." (*See* Doc. No. 3-11 at 2–6.) Defendant USDA has recognized that FLS data is used "to help ensure federal assistance for farm worker assistance programs supported with government funding" and "by farm worker organizations to help set wage rates and negotiate labor contracts as well as determine the need for additional workers." 83 Fed. Reg. at 50632. Plaintiffs aver that these federal programs use information about farmworker populations collected by the FLS to allocate federal funding and other resources to provide economic, housing, professional, educational, and legal assistance to farmworkers. Finally, federal and state policymakers use FLS data to assess farm labor supply and demand. *See, e.g.*, *Agency Information Collection Activities; Comment Request; National Agricultural Workers Survey*, 84 Fed. Reg. 35886, 35886 (July 25, 2019) (explaining that the DOL uses FLS data to conduct the National Agricultural Workers Survey ("NAWS"), and that various federal agencies also "use [NAWS] data to estimate the number and characteristics of crop workers and their dependents who qualify to participate in or receive services from various migrant and seasonal farmworker programs"). Again, defendants do not address or contest any of these assertions in their brief in opposition to the pending motion.

The court finds that plaintiffs have demonstrated a likelihood of success on the merits of this claim. The Suspension Notice acknowledges that reliance interests exist: the FLS is used for setting the AEWR for the H-2A program, and "[s]urvey data have also been used to carry out provisions of the Agricultural Adjustment Act." 85 Fed. Reg. 61719. Without more, the agency decided to cease conducting the FLS, stating in conclusory fashion that "the public can access other data sources for the data collected." *Id.* Importantly, some of the sources that the Suspension Notice itself identifies as potential substitutes for the FLS, such as the NAWS, rely on FLS data itself for accuracy. *Id.*; *see also* 84 Fed. Reg. 35886. "In light of the serious reliance interests at stake, [defendant USDA's] conclusory statements do not suffice to explain its decision" and "cannot carry the force of law." *See Encino Motorcars*, 136 S. Ct. at 2127. Accordingly, plaintiffs have made a showing of likelihood of success on this claim.

/////

2.      Whether the Suspension Notice is Arbitrary and Capricious Because USDA Failed to Articulate a Plausible Rationale that Could Justify It

In their second claim, plaintiffs allege that defendant USDA's decision to discontinue the FLS and cease publication of the FLR is a final agency action that is arbitrary and capricious because it reflects no reasoned decision making and provides no rationale for the determination. (Compl. at ¶¶ 70–73.)  It is "a fundamental requirement of administrative law . . . that an agency set forth its reasons for decision; an agency's failure to do so constitutes arbitrary and capricious agency action." *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014). "[C]onclusory statements will not do; an agency's statement must be one of reasoning." *Id.* (internal quotation marks omitted); *see also Dep't of Commerce*, 139 S. Ct. at 2569 (an agency must "articulate[] a satisfactory explanation for [its] decision").

Here, plaintiffs argue that defendant USDA has changed positions without "display[ing] awareness that it is" doing so and "show[ing] that there are good reasons for the new policy." (Doc. No. 3 at 22) (citing *Fox Television Stations*, 556 U.S. at 515).  Plaintiffs assert that the only stated justification for defendant USDA's decision in the Suspension Notice is that "the public can access other data sources for the data collected in the Agricultural Labor Survey."  85 Fed. Reg. at 61719.  First, even if alternative data sources were available, plaintiffs correctly note that this alone does not provide a reasoned explanation for the agency's change of position.  (Doc. No. 3 at 22.)  Because the DOL is required by regulation to rely on FLS data to publish AEWRs for the H-2A program, the available alternatives are unhelpful and insufficient.  (*Id.*) (citing 20 C.F.R. § 655.103(b)).  Second, plaintiffs persuasively argue that the Suspension Notice's conclusory statement is insufficient to justify defendant USDA's change in position.  According to plaintiffs, defendant USDA's suggestion that FLS data is redundant is contradicted by defendant USDA and the DOL's own prior statements on that subject.  As noted above, defendant USDA has recognized that the FLS is essential for administering several programs.  Defendants' conclusory statement that the public can access other data sources in lieu of the FLS is an about face that the Suspension Notice fails to even acknowledge.  This is insufficient to survive review
/////

19

under the arbitrary and capricious standard.  As one district court has observed under similar circumstances:

> More detail is required when, for example, the agency's new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account.  In such cases it is not that further justification is demanded by the mere fact of policy change; but that a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy.

*Nat'l Urban League*, 2020 WL 5739144, at *43 (internal citations and quotation marks omitted).

Accordingly, the court concludes that plaintiffs have made a showing of their likelihood of success on the merits of this claim as well.

3.   Whether the Suspension Notice Violates the APA's Notice-and-Comment Requirement

In their third claim, plaintiffs allege that defendant USDA's decision to discontinue the FLS and cease publication of the FLR is a substantive rule that should be vacated because defendants did not abide by the requirements of notice and comment rulemaking before the Suspension Notice was issued.  (Compl. at ¶¶ 74–81.)

Under the APA, a court reviewing an agency action must set it aside if it was taken "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).  "The APA requires public notice and comment and a thirty-day grace period before a proposed rule takes effect."  *E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1277 (9th Cir. 2020) (citing 5 U.S.C. §§ 553(b) – (d)).  "However, interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice are exempt from the notice and comment requirement."  *Gill v. United States Dep't of Justice*, 913 F.3d 1179, 1185–86 (9th Cir. 2019) (internal citation and quotation marks omitted).

As a preliminary matter, the court finds that plaintiffs have demonstrated serious questions as to whether the Suspension Notice is a rule.  "'Rule,' . . . is defined broadly to include 'statement[s] of general or particular applicability and future effect' that are designed to 'implement, interpret, or prescribe law or policy.'"  *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 95–96 (2015).  As noted above and in the Suspension Notice itself, defendant USDA conducts the

20

1    FLS under the authority set forth at 7 U.S.C. § 2204, and it is therefore an implementation of that

2    statutory provision.  *See* 85 Fed. Reg. 61719.

3        The court does find it to be a closer call as to whether the Suspension Notice is a general

4    statement of policy, as defendants argue (Doc. No. 27 at 23), or a substantive rule, as plaintiffs

5    contend (Doc. No. 3 at 25).  In "distinguish[ing] a substantive rule from a general statement of

6    policy," the Ninth Circuit has held that

7            "[t]he critical factor to determine whether a directive announcing a
             new policy constitutes a rule or a general statement of policy is 'the
8            extent to which the challenged [directive] leaves the agency, or its

9            implementing official free to exercise discretion to follow, or not to
             follow, the [announced] policy in an individual case . . . .
10
             To the extent that the directive merely provides guidance to agency
11           officials in exercising their discretionary power while preserving
             their flexibility and their opportunity to make 'individualized
12           determination[s],' it constitutes a general statement of policy . . . .  In
             contrast, to the extent that the directive 'narrowly limits
13           administrative discretion' or establishes a 'binding norm' that 'so
             fills out the statutory scheme that upon application one need only
14           determine whether a given case is within the rule's criterion,' it
             effectively replaces agency discretion with a new 'binding rule of
15           substantial law.'"

16   *Colwell v. Dep't of Health & Human Servs.*, 558 F.3d 1112, 1124 (9th Cir. 2009) (citing *Mada-*

17   *Luna v. Fitzpatrick*, 813 F.2d 1006, 1013–14 (9th Cir.1987)).

18       Here, plaintiffs argue that defendant USDA's decision to discontinue the FLS and cease

19   publication of the FLR is a substantive rule because it is a departure from established agency

20   practice that will have the effect of negating farmworkers' rights to wage protections that have

21   long been available and required by the DOL to satisfy its own statutory obligations.  (Doc. No. 3

22   at 25.)  Plaintiffs argue that defendant USDA's decision effectively eliminates the AEWR,

23   allowing employers to pay farmworkers lower wages, resulting in drastic impacts on the wages of

24   those farmworkers across the country.  (*Id.*)  They reason that these substantial effects on

25   farmworkers' rights and financial condition mean that the Suspension Notice is substantive and is

26   therefore subject to notice-and-comment requirements.  (*Id.*); *see also Mendoza*, 754 F.3d at

27   1024–25 (explaining that the DOL was required to follow notice-and-comment requirements

28   when the issuing agency guidance that effectively "set the bar for what employers must do to

21

1   obtain approval" by eliminating the AEWR for H-2A herders, and "[i]n doing so, [] substantially

2   affect[ed] the rights and interests of both herders and employers").

3       Defendants' arguments on this point are not wholly unpersuasive.  Defendants assume

4   *arguendo* that the Suspension Notice is a rule but assert that it is an interpretive rule that is not

5   subject to notice-and-comment rulemaking for three reasons.  First, defendants argue that

6   USDA's decision whether to collect FLS data is wholly discretionary and not mandated by

7   Congress, and thus defendant USDA is not exercising "delegated legislative power" here.  (Doc.

8   No. 27 at 22) (citing *Am. Min. Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1109 (D.C.

9   Cir. 1993)).  As explained above, the court has already concluded that defendant USDA's

10  discretion to conduct the FLS is not completely unbounded.  The court also acknowledges,

11  however, that the agency ultimately carrying out a delegated legislative power in this instance is

12  the DOL, by way of setting the AEWRs.  *See* 8 U.S.C. § 1188 (a)(1)(B).  Second, defendants

13  argue that the Suspension Notice does not amend a prior legislative rule but instead "comes on

14  the heels of notices in 2007 and 2011 announcing the suspension and resumption of information

15  collection, all of which were issued without notice and comment."  (*Id.* at 22) (citing 76 Fed. Reg.

16  38110; 76 Fed. Reg. 28730; 72 Fed. Reg. 24270; 72 Fed. Reg. 5675); *see also Mortg. Bankers*

17  *Ass'n*, 575 U.S. at 101 ("Because an agency is not required to use notice-and-comment

18  procedures to issue an initial [non-legislative] rule, it is also not required to use those procedures

19  when it amends or repeals that [non-legislative] rule.").  According to defendants, "at most, 'the

20  announcement' that USDA 'will discontinue a discretionary' data collection program is a 'general

21  statement of policy' not subject to the APA's notice-and-comment requirements."  (Doc. No. 27

22  at 22.)  The fact that prior suspensions and resumptions of the FLS were issued without notice-

23  and-comment does not, however, establish that those actions were lawful, since the court is

24  unaware of any legal challenges made to those prior notices on the grounds that they violated

25  § 553 and the parties have cited none.

26      In the end, while there are sound arguments on both sides of the issue, the court concludes

27  that plaintiffs have demonstrated that there are "serious questions" as to whether the Suspension

28  /////

1    Notice is a substantive rule that is subject to the notice-and-comment rulemaking requirements as

2    asserted in their third claim for relief.[6]

3         **3.    Irreparable Harm**

4         Having found that plaintiffs have shown a likelihood of success on the merits of their first

5    and second claims, and have raised "serious questions" as to the merits of their third claim, the

6    court now turns to whether plaintiffs have shown a likelihood that they will suffer irreparable

7    harm in the absence of the granting of preliminary injunctive relief.  The risk of irreparable harm

8    must be "likely, not just possible." *All. for the Wild Rockies*, 632 F.3d at 1131.  "Speculative

9    injury does not constitute irreparable injury sufficient to warrant granting a preliminary

10   injunction." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988).

11   "[E]conomic hardship constitutes irreparable harm." *Kildare v. Saenz*, 325 F.3d 1078, 1083 (9th

12   Cir. 2003).  For low-income individuals, economic loss can mean inadequate access to "food,

13   shelter [and] other necessities." *Id.*; *cf. Paxton v. Sec'y of Health & Human Servs.*, 856 F.2d

14   1352, 1354 (9th Cir. 1988) ("When a family is living at subsistence level, the subtraction of any

15   benefit can make a significant difference to its budget and to its ability to survive.").

16        Here, plaintiffs assert that their members include U.S. and H-2A farmworkers who will be

17   irreparably harmed absent the granting of the requested temporary restraining order and

18   preliminary injunction.  (Doc. No. 3 at 27.)  According to the declaration of Diana Tellefson

19   Torres, executive director of UFW Foundation, farmworkers are among the lowest-paid workers

20   in the United States, with many earning a subsistence income.  (Doc. No. 3-34 at ¶ 17.)  Declarant

21   Torres states that at least 33 percent of farmworker families live below the poverty line, struggle

22   to feed themselves, and lack adequate healthcare.  (*Id.* at ¶¶ 6, 7.)  Since the COVID-19

23

24   [6]  It should be noted that, unsurprisingly, neither party has suggested that a DOL decision to
     completely change its long-standing approach of relying on the FLS to calculate the AEWR for
25   the H-2A program would not be subject to the notice-and-comment requirements.  Indeed, the
     Pasternak Declaration establishes that the DOL is quickly attempting to develop a final rule for
26   publication in light of defendant USDA's action.  (*See* Doc. No. 27-1 at 3.)  Just as in *Gifford
     Pinchot Task Force v. Perez* discussed above, defendant USDA's action here is part of the DOL's
27   required action under the regulatory scheme, supporting the conclusion that the Suspension
     Notice is subject to notice-and comment requirements.
28

pandemic, 37.9 percent of farmworkers surveyed by the UFW Foundation have responded that their hours have been reduced.  (*Id.* at ¶ 8.)  Similarly, the declaration of Teresa Romero, president of the United Farm Workers union, states that many UFW members could not afford to support themselves or their families if wages were lowered by even one or two dollars per hour.  (Doc. No. 3-33 at ¶ 18.)  Plaintiffs argue that as a result of defendants' action, plaintiffs' members who work in California will likely face a 5 percent wage cut, and Idaho members will face a 46 percent wage cut—wage decreases that would cause substantial harm to plaintiffs' members and their families.  (*See id.*)  Thus, in the absence of the granting of injunctive relief, farmworkers will suffer immediate harms in the form of economic hardship that cannot be undone through the payment of back wages.  (*See id.* at ¶ 21.)

In opposition, defendants argue that plaintiffs cannot demonstrate irreparable harm because they cannot demonstrate an Article III injury in fact.  (Doc. No. 27 at 23.)  Defendants contend that any injury plaintiffs have purportedly suffered is not traceable to the actions of defendant USDA, but rather the result of potential downstream and independent decisions of the DOL that may take effect beginning in January 2021.  (*Id.* at 23.)  According to defendants, plaintiffs allege at least two causes of their alleged injuries, and both depend on decisions to be made or actions to be taken by the DOL in the future.  According to defendants, plaintiffs are concerned that either:  (1) DOL will not establish the 2021 AEWRs by the end of the year without defendant USDA's FLS data; and/or (2) even if the DOL somehow did establish the 2021 AEWRs using other available data, the resulting wage rate would necessarily be lower than if the DOL had been able to use the USDA collected data.  (*Id.* at 23–24.)  Defendants argue that these allegations do not demonstrate traceability to a USDA action, and "[i]n any event, these theories of alleged causation are either belied by DOL's historical practice and its future intentions or constitute conjecture" because DOL has previously used other data to calculate the AEWR, it announced last year that it was revisiting its AEWR calculation methodology, and it has committed to publishing a final rule setting forth that new methodology "before the end of the calendar year to ensure there is no disruption in setting these AEWRs for calendar year 2021."  (*Id.* at 24) (citing Doc. No. 27-1 at ¶ 9).

1    The court is not persuaded by defendants' arguments.  As explained above, the harm that

2    plaintiffs allege is directly traceable to defendant USDA's decision to suspend the FLS because

3    the Suspension Notice and the AEWRs are inextricably connected.  The fact that there are

4    multiple players in the causal link between defendant USDA's action and plaintiffs' harm does

5    not render the harm untraceable.  *See Dep't of Commerce*, 139 S. Ct. at 2566 ("Respondents'

6    theory of standing thus does not rest on mere speculation about the decisions of third parties; it

7    relies instead on the predictable effect of Government action on the decisions of third parties.

8    Because Article III 'requires no more than *de facto* causality,' traceability is satisfied here.")

9    (internal citations omitted); *Nat'l Urban League*, 2020 WL 5739144, at *23 (finding that the

10   Department of Commerce's new census collection plan would necessarily affect the President's

11   apportionment calculations, which are statutorily required to be based on decennial census data

12   alone, and thus injure plaintiffs in legally cognizable ways).

13   Moreover, as the regulatory scheme currently exists, the AEWRs cannot be calculated

14   without the FLS.  Defendants have repeatedly noted that the DOL is "taking this into account" as

15   it promulgates a rule with a new methodology.  But as plaintiffs correctly noted at the hearing on

16   the pending motion, if the DOL's new methodology is challenged and ultimately set aside, and

17   the 2021 AEWRs ultimately require the FLS data to be calculated, they will suffer irreparable

18   harm if the court does not preserve the status quo now because the October 2020 FLS data will

19   not have been gathered and will not be available when it is needed.  As concluded above, the

20   Suspension Notice is itself a final agency action, and thus plaintiffs' challenge to the Suspension

21   Notice is a live controversy.  The fact that the controversy may be mooted in the future if the

22   DOL's impending final rule removes any reliance on the FLS does not compel the dismissal of

23   this challenge.  *Hunt v. Imperial Merchant Services*, Inc., 560 F.3d 1137, 1142 (9th Cir.2009)

24   (acknowledging that the court is "not required to dismiss a live controversy as moot merely

25   because it may become moot in the near future").  Accordingly, the court is persuaded that

26   consideration of this *Winter* factor weighs in favor of the granting of injunctive relief.

27   /////

28   /////

25

1    **4.      Balance of the Hardships**

2          Courts "must balance the competing claims of injury and must consider the effect on each

3    party of the granting or withholding of the requested relief," and "should pay particular regard for

4    the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S.

5    at 24. "In assessing whether the plaintiffs have met this burden, the district court has a duty to

6    balance the interests of all parties and weigh the damage to each." *Stormans, Inc. v. Selecky*, 586

7    F.3d 1109, 1138 (9th Cir. 2009) (internal quotation marks and alteration omitted). "Where the

8    government is a party to a case in which a preliminary injunction is sought, the balance of the

9    equities and public interest factors merge." *Padilla v. Immigration & Customs Enf't*, 953 F.3d

10   1134, 1141 (9th Cir. 2020) (citing *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th

11   Cir. 2014)). As one district court has stated:

12
13               There is generally no public interest in the perpetuation of unlawful
                 agency action. To the contrary, there is a substantial public interest
                 in having governmental agencies abide by the federal laws that
14               govern their existence and operations.

15   *Washington v. DeVos*, No. 2:20-cv-1119-BJR, 2020 WL 5079038, at *10 (W.D. Wash. Aug. 21,

16   2020) (citing *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)).

17         Here, plaintiffs argue that the balance of the hardships weighs in favor of granting

18   injunctive relief because the public interest is served by preventing U.S. farmworkers' wages

19   from falling and by facilitating the effective administration of the H-2A foreign guest worker visa

20   program. (Doc. No. 3 at 29–30.) Additionally, they argue that the public interest is also served

21   by maintaining the long-established status quo of conducting the FLS and publishing the FLR

22   during the pendency of this litigation, rather than permitting the Suspension Notice to

23   fundamentally alter defendant USDA's and the DOL's historical practices in this regard. (*Id.* at

24   30); *see also Doe #1 v. Trump*, 957 F.3d 1050, 1069 (9th Cir. 2020) (holding "the public interest

25   favors preserving the status quo"). Plaintiffs contend that those interests are particularly strong

26   where an agency's practice has "for countless decades" allowed the government to administer "a

27   stable immigration system." (Doc. No. 3 at 30); *see also Trump*, 957 F.3d at 1069.

28   /////

1    In opposition, defendants argue that plaintiffs are not seeking to preserve the status quo

2    but instead have requested a "mandatory injunction" ordering defendant USDA to conduct the

3    FLS and publish the FLR.  (Doc. No. 27 at 25.)  Defendants assert that "mandatory injunctions"

4    are "particularly disfavored" and are only permissible if "extreme or very serious damage will

5    result."  (*Id.*) (citing *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873,

6    880 (9th Cir. 2009)).  Defendants also contend that a "mandatory TRO would force USDA to

7    reallocate its priorities and spend significant resources on a survey that receives no specific

8    appropriation from Congress—all before the Court has had an opportunity to review the

9    administrative record and decide the case at a more developed posture."  (*Id.*)  Defendants assert

10   that such interference with federal agency's discretionary choices is not in the public interest

11   because "[t]he agency is far better equipped than the courts to deal with the many variables

12   involved in the proper ordering of its priorities."  (*Id.* at 26) (citing *Heckler*, 470 U.S. at 831–32).

13   Having considered the arguments of the parties, the court concludes that the balance of

14   hardships tips in favor of the granting of the requested injunctive relief.  First, the court is not

15   persuaded by defendants' arguments that such relief in this case would constitute a "mandatory

16   injunction."  The Ninth Circuit's decision in *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH*

17   *& Co.*, upon which defendants rely, is distinguishable.  There, the district court ordered the

18   nutraceutical company to cease manufacturing and distributing its product, recall the already-

19   distributed products, and provide restitution to its customers.  571 F.3d at 878.  The court

20   distinguished that mandatory injunction, which ordered the responsible party to act, from

21   prohibitory injunctions, which "prohibit[] a party from taking action and preserve the status quo

22   pending a determination of the action on the merits."  *Id.* (internal citation and quotation marks

23   omitted).  In this case, injunctive relief would not direct defendant USDA to take any additional

24   action that it otherwise would not have undertaken.  Whereas the nutraceutical company in

25   *Marlyn* was directed to recall products and provide restitution, injunctive relief in this case would

26   merely preserve the status quo by prohibiting defendant USDA from giving effect to the

27   Suspension Notice.  Thus, defendant USDA would simply proceed as it would have had the

28   recent Suspension Notice never been issued.  Moreover, the court is not persuaded that an

1    injunction requiring defendant USDA to set aside the resources for the October 2020 FLS would

2    tip the hardship balance against granting relief.  The court sees no reason to infer that defendant

3    USDA lacks the resources for a survey it has been conducting for many years, and toward which

4    the DOL has committed funding for until 2022.  Unlike the 2007 and 2011 suspensions of the

5    FLS, which were explicitly based on budget constraints, the Suspension Notice at issue here

6    makes no mention of such resource constraints.  *Compare* 76 Fed. Reg. 28730; 72 Fed. Reg.

7    5675, *with* 85 Fed. Reg. 61719.

8    　　　　Because of the hardships that the public will face if the FLS is not conducted and the DOL

9    is unable to satisfy its current statutory and regulatory obligations, the court finds that the balance

10   of the hardships in this case weighs in favor of granting injunctive relief.

11   **CONCLUSION**

12   　　　　For the reasons set forth above:

13   　　1.　　Plaintiffs' motion for a temporary restraining order and a preliminary injunction

14   　　　　　　(Doc. No. 3) is granted;

15   　　2.　　The court orders that defendants shall be restrained and prevented from giving

16   　　　　　　effect to the September 30, 2020 decision to suspend the October 2020 FLS and

17   　　　　　　cease publication of the November 2020 FLR; and

18   　　3.　　Pursuant to Rule 65(c) of the Federal Rules of Civil Procedure, absent subsequent

19   　　　　　　waiver by the court, on or before Friday, October 30, 2020, plaintiffs must post a

20   　　　　　　$1,000.00 bond.

21   IT IS SO ORDERED.

22   　　Dated:　__**October 28, 2020**__　　　　　　　　　　　　　　　　　　

23   　　　　　　　　　　　　　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE

24

25

26

27

28